# Illinois Official Reports

## Appellate Court

---

**Freedom Mortgage Corp. v. Olivera**, 2021 IL App (2d) 190462

---

Appellate Court
Caption

FREEDOM MORTGAGE CORPORATION, Plaintiff-Appellant and Cross-Appellee, v. MICHAEL OLIVERA; J. RIVKAH S. OLIVERA, Individually and as Guardian of the Estate of W.D. Michael Baez; THE ESTATE OF W.D. MICHAEL BAEZ; HEARTLAND MEADOWS SINGLE FAMILY HOMEOWNER'S ASSOCIATION; UNKNOWN OWNERS and NONRECORD CLAIMANTS, Defendants (Michael Olivera; J. Rivkah S. Olivera, Individually and as Guardian of the Estate of W.D. Michael Baez; the Estate of W.D. Michael Baez, Defendants-Appellees and Cross-Appellants).

District & No.

Second District
No. 2-19-0462

Filed

August 5, 2021

Decision Under
Review

Appeal from the Circuit Court of Kane County, No. 17-CH-492; the Hon. M. Katherine Moran, Judge, presiding.

Judgment

Affirmed in part, vacated in part, and remanded with directions.

Counsel on
Appeal

Phil Schroeder, of McCalla Raymer Leibert Pierce, LLC, of Chicago, for appellant.

Aaron T. Troy, of Rolewick & Gutzke, P.C., of Wheaton, for appellees.

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Schostok concurred in the judgment and opinion.


# OPINION

¶ 1        Plaintiff, Freedom Mortgage Corporation, appeals the trial court's dismissal, pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2018)), of its mortgage-foreclosure complaint against defendants, Michael Olivera, J. Rivkah S. Olivera (individually and as guardian of the estate of W.D. Michael Baez), the estate of W.D. Michael Baez, Heartland Meadows Single Family Homeowner's Association, and unknown owners and nonrecord claimants. In their cross-appeal, defendants Michael Olivera, J. Rivkah S. Olivera, and the estate of W.D. Michael Baez challenge the trial court's order denying their request for Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018) sanctions against plaintiff. For the following reasons, we affirm in part, vacate in part, and remand with directions.

¶ 2                                    I. BACKGROUND
¶ 3                                    A. 2012 Complaint
¶ 4        In 2012, plaintiff filed against defendants Michael Olivera (Michael), J. Rivkah S. Olivera (Rivkah), and W.D. Michael Baez (Baez)[1] a foreclosure complaint pertaining to defendants' residence at 11 Juli Court in South Elgin. The complaint alleged that the mortgage loan had a default date of September 2011. In 2013, plaintiff amended the complaint to add as defendants unknown owners and nonrecord claimants.[2]

¶ 5        In 2015, pursuant to section 2-619(a) of the Code, defendants moved to dismiss the complaint for failure to name a necessary party, specifically, Baez's estate, as it was one of the three mortgagors (with Michael and Rivkah being the other two) for the subject property. On September 16, 2015, the court dismissed the amended complaint without prejudice.

¶ 6        In October 2015, plaintiff filed a second amended complaint, naming all defendants. However, in April 2016, defendants again moved to dismiss, this time arguing that (1) the subject mortgage was a Federal Housing Administration (FHA) mortgage and plaintiff was a lender insured by the United States Department of Housing and Urban Development (HUD); (2) pursuant to HUD regulations, plaintiff was required to make certain reasonable attempts to meet with and communicate with the mortgagors before three monthly payments on the mortgage went unpaid and before filing for foreclosure (24 C.F.R. § 203.604(b)-(d) (2014));[3]

---

[1]Baez is the Oliveras' son and is a disabled adult. A guardianship estate for him was established in 2007.

[2]We note that some of the facts in this section are gleaned from defendants' motion for sanctions, as not all documents from the 2012 litigation are included in the record for the present case. However, none of the essential facts concerning the 2012 litigation appear to be disputed.

[3]The relevant regulations provide:

    "(b) The mortgagee must have a face-to-face interview with the mortgagor, or make a reasonable effort to arrange such a meeting, before three full monthly installments due on the

(3) the mortgage required plaintiff's compliance with the HUD regulations and Illinois law interprets the federal regulations as mandatory conditions precedent that, if not complied with, give rise to a valid defense in a foreclosure action (see, *e.g.*, *Bankers Life Co. v. Denton*, 120 Ill. App. 3d 576 (1983)); and (4) plaintiff did not make reasonable efforts to communicate with defendants in the time frame required by the federal regulations. Plaintiff responded that it was not required to comply with the regulations at issue because it did not have a branch office within 200 miles of the subject property. In reply, defendants explained that the relevant time frame was around when the loan allegedly went into default, *i.e.*, in 2011, and at *that time*, plaintiff *did* maintain a branch office within 200 miles of the property and, thus, plaintiff was *not* exempt from complying with the regulations.

¶ 7    Plaintiff ultimately moved for voluntary dismissal, seeking leave to comply with the regulations and to refile its complaint. On December 14, 2016, because defendants' motion to dismiss was already pending, the court denied plaintiff's motion for voluntary dismissal. It granted defendants' motion to dismiss on the ground that plaintiff did not, before filing the complaint, comply with the federal regulations. However, it gave plaintiff leave to refile, stating that the dismissal was "without prejudice for the purpose of the plaintiff complying with any conditions precedent as required under the HUD regulations."

¶ 8                                    B. 2017 Complaint

¶ 9    On May 24, 2017, plaintiff filed a new foreclosure case against defendants. The 2017 complaint was virtually identical to the second amended complaint that had been filed in the 2012 case. Specifically, it noted that the $278,469 mortgage was entered into on December 10, 2009, it alleged the same September 2011 default date, and it attached the relevant note and the mortgage.

---

mortgage are unpaid. If default occurs in a repayment plan arranged other than during a personal interview, the mortgagee must have a face-to-face meeting with the mortgagor, or make a reasonable attempt to arrange such a meeting within 30 days after such default and at least 30 days before foreclosure is commenced ***.

(c) A face-to-face meeting is not required if:

(1) The mortgagor does not reside in the mortgaged property,

(2) The mortgaged property is not within 200 miles of the mortgagee, its servicer, or a branch office of either,

(3) The mortgagor has clearly indicated that he [or she] will not cooperate in the interview,

(4) A repayment plan consistent with the mortgagor's circumstances is entered into to bring the mortgagor's account current thus making a meeting unnecessary, and payments thereunder are current, or

(5) A reasonable effort to arrange a meeting is unsuccessful.

(d) A reasonable effort to arrange a face-to-face meeting with the mortgagor shall consist at a minimum of one letter sent to the mortgagor certified by the Postal Service as having been dispatched. Such a reasonable effort to arrange a face-to-face meeting shall also include at least one trip to see the mortgagor at the mortgaged property, unless the mortgaged property is more than 200 miles from the mortgagee, its servicer, or a branch office of either, or it is known that the mortgagor is not residing in the mortgaged property." 24 C.F.R. § 203.604(b)-(d) (2014).

¶ 10        Again, pursuant to section 2-619(a)(1) and 2-619(a)(9) of the Code, defendants moved to dismiss the 2017 complaint. They argued that plaintiff did not, in 2012 and prior to accelerating the alleged debt and filing its foreclosure actions, comply with the HUD regulations. Defendants noted that the HUD regulations were incorporated into the note and the mortgage, and they asserted that there is no authority for plaintiff to comply with the regulations retroactively, *i.e.*, after a default is alleged to have occurred and a foreclosure action has commenced. Defendants attached to their motion three affidavits—from Michael, Rivkah, and Rivkah in her capacity as the guardian of Baez's estate—averring that plaintiff never met with or advised them of their eligibility for various FHA or HUD loss-mitigation programs to cure their alleged default; they were never contacted by, nor received a request or communication from, plaintiff to arrange a face-to-face meeting regarding the mortgage, never met with plaintiff at their home or any other location, and never refused to meet with plaintiff.

¶ 11        Plaintiff responded that it made reasonable efforts to comply with the regulations when, on January 6, 2017, it sent defendants a certified letter, which was delivered and signed for on January 13, 2017. Also, plaintiff alleged, on January 7, 2017, it sent a representative to visit the property for the purpose of arranging a face-to-face meeting. Plaintiff alleged that, at the property visit, it "came in contact with" Rivkah and gave her information about arranging a face-to-face meeting to discuss repayment options. "Defendants were unresponsive or unwilling to arrange a face[-]to[-]face meeting." Plaintiff attached to its response an affidavit from Erica Tracy, one of plaintiff's loan specialists, who attested, in part, that (1) a solicitation letter was sent to the subject property and signed for, and the letter and proof of mailing and delivery were attached and (2) the property was visited and, at the visit, "contact was made with a borrower who was provided information" and a copy of the "results from the property visit" were attached. We have reviewed the documents: the attached proof of delivery shows an illegible signature, and the "results from the property visit" comprise a form, completed by a field representative, stating, in part, that he "spoke with the borrower who noted that she has been in the hospital and will give [the] letter to her lawyer."

¶ 12        Plaintiff further argued that, as to Rivkah, it was not required to comply with the regulations, because she filed for bankruptcy and was discharged in 2015. In addition, plaintiff argued that, as to Michael, it was not required to comply with the regulations, because he no longer lived at the subject property. Plaintiff argued that its compliance with the regulations was sufficient and that dismissal based upon the temporal requirements (*i.e.*, that compliance did not occur before three monthly installments went unpaid) should again be rejected because, in the prior case, defendants made the same argument and, yet, the court dismissed *without prejudice* and with leave to refile. Plaintiff urged that rigid enforcement of the temporal requirements would result in an unwarranted windfall to borrowers and an unduly harsh penalty to lenders. According to plaintiff, the regulations do not suggest that the failure to strictly comply with the temporal requirements is a basis to render the mortgage forever unenforceable. Plaintiff claimed that advancing payments to defendants to make the mortgage current would be futile, as one mortgagor had already discharged her debts in bankruptcy and had not redeemed or reaffirmed the debt and another mortgagor no longer lived at the property.

¶ 13        Defendants replied that plaintiff's efforts in 2017 were insufficient, as they occurred *five years after* the September 2011 alleged date of default. In contrast, the regulations require certain overtures within a three-month period *prior* to the default; specifically, in this case, the efforts were required to have been made *before* January 2012. Moreover, defendants disagreed

that the bankruptcy or Michael's residency were relevant or absolved plaintiff's obligations, as both circumstances occurred *after* the alleged default and neither circumstance existed when plaintiff was required to attempt compliance with the regulations. Defendants also noted that no communication was sent to Baez's estate, the third mortgagor and a distinct legal entity. Defendants also challenged the field representative's purported meeting with Rivkah, where the form he provided mentioned only an unidentified "borrower" who had been hospitalized. Rivkah, in fact, submitted another affidavit, attesting that the field representative's representations were false and flatly denying that she spoke with anyone on January 7, 2017, was given or signed for a letter, or had been in a hospital. Additional affidavits were also submitted by Rivkah as guardian of Baez's estate and by Michael, both disputing any contact with plaintiff or receipt of letters.

¶ 14    Finally, defendants countered plaintiff's "windfall" arguments with authority that the guidelines and purpose of the housing program become meaningless if, despite noncompliance, a mortgagee may still foreclose. They further argued that the failure to comply with the HUD regulations until five years after the default date is not merely an "immaterial defect" and that,

> "assuming that plaintiff will incur a financial loss if this complaint were dismissed with prejudice, it pales in comparison to the financial harm the defendants have already suffered in defending against this frivolous action. This foreclosure litigation has been pending for over six years and has been re-filed by plaintiff at least three separate times. *** In relative terms, the tens of thousands of dollars of legal fees borne by the defendants dwarfs the 'loss' plaintiff may suffer on one unenforceable loan, especially for a company that bills itself as a 'top mortgage provider' and which reported $2,000,000,000 in funded loans as of June, 2014 (and *especially* when considering that any such 'loss' incurred by plaintiff would be directly caused by plaintiff's own noncompliance with HUD regulations)." (Emphasis in original.)

¶ 15    The court allowed plaintiff to file a sur-response. Plaintiff again argued, in part, that substantial compliance with the regulations was sufficient. It did not provide any counteraffidavits to rebut the affidavits that defendants had submitted with their reply. Defendants were allowed a sur-reply, in which they reiterated, in part, that Rivkah had not surrendered her property in bankruptcy. They argued that, where it intentionally and recklessly failed to properly perform its servicing duties pursuant to the regulations, plaintiff's unclean hands should preclude equitable relief.

¶ 16    On December 19, 2018, after a hearing, the court granted with prejudice the motion to dismiss. It explained:

> "[P]laintiff does not dispute its compliance with HUD regulations was not achieved or attempted until January of 2017. While the Court finds plaintiff has standing, this Court finds plaintiff has failed to meet a condition precedent to filing its complaint for foreclosure.
>
> There does not appear to be any way to cure this failing where the complaint for foreclosure is based on the *September 2011* default." (Emphasis added.)

¶ 17    Plaintiff moved the court to reconsider. On May 1, 2019, the court denied the motion, and on May 30, 2019, plaintiff filed its notice of appeal.

C. Sanctions

¶ 19 On January 18, 2019, defendants moved for Rule 137 sanctions. See Ill. S. Ct. R. 137 (eff. Jan. 1. 2018). In sum, defendants argued that plaintiff's 2017 cause of action was not grounded in fact nor warranted by existing law or a good-faith argument for the modification of existing law, because plaintiff knew that it had not complied with the HUD regulations, its failure provided defendants with a valid defense to the complaint, and its 2012 case, which was virtually identical and listed the same alleged default date, had been dismissed for the exact same reason as the 2017 complaint. "It is difficult to imagine *any* good[-]faith argument to extend a federally-imposed deadline from 90 days to five and a half years, as plaintiff attempted to do in this case." (Emphasis in original.) Defendants requested $50,336.31 in attorney fees and costs and attached itemized statements pertaining to those charges.

¶ 20 In response, plaintiff noted that its filings were not made in bad faith, that they raised issues of first impression concerning the regulations' temporal requirements, and, further, that its decision to refile the foreclosure action in 2017 was partly due to the history of the case, explaining:

> "Defendants previously raised their argument about strict compliance with the temporal requirements in 24 C.F.R. 203.604 and advocated for a dismissal *with prejudice* in the previous litigation \*\*\*. This Court rejected this argument when it declined to dismiss [the 2012 case] with prejudice and instead dismissed that action without prejudice and *with leave to refile*. [Citation.] Plaintiff then satisfied the condition precedent in 24 C.F.R. 203.604 and refiled its case." (Emphases in original.)

¶ 21 In reply, defendants disagreed that plaintiff's filings were pursued in good faith, particularly where plaintiff knew that it had not complied with the regulations. Further, defendants noted that, as they had prevailed, the court could award them attorney fees and costs pursuant to section 15-1510 of the Illinois Mortgage Foreclosure Law (735 ILCS 5/15-1510 (West 2018)). On May 1, 2019, after a hearing, the court denied the motion for sanctions. On June 6, 2019, defendants filed their notice of cross-appeal.[4]

¶ 22 This court allowed the parties to file a supplemental record reflecting that, after the notices of appeal were filed, the trial court, on October 2, 2019, granted defendants' request under section 15-1510 for attorney fees and costs and allowed the parties to present evidence in support of their respective positions. On November 20, 2019, the trial court awarded defendants $27,274.55 in attorney fees and costs against plaintiff. The court noted that there was no just reason to delay enforcement or appeal of the order and that it retained jurisdiction to enforce the order. The propriety of that order is not before us on appeal; however, defendants request that if they prevail we award, under section 15-1510, reimbursement of their appellate attorney fees.

¶ 23 II. ANALYSIS

¶ 24 On appeal, plaintiff argues that the court's dismissal of its complaint with prejudice was incorrect, because (1) plaintiff was not required to arrange a face-to-face meeting prior to filing the 2017 foreclosure action, as (a) Michael did not reside at the property, (b) Rivkah filed for

---

[4]Defendants' cross-appeal remains timely, even though the notice of appeal was filed more than 30 days after the judgment they are appealing, because it was filed within 10 days of service of plaintiff's notice of appeal. See Ill. S. Ct. R. 303(a)(3) (eff. July 1, 2017).

bankruptcy and received a discharge and, thus, is barred from raising a defense to foreclosure, and (c) dismissal was futile, as there would be no requirement to have a face-to-face meeting prior to filing a new foreclosure action; (2) it made reasonable efforts to comply with section 203.604 of Title 24 of the Code of Federal Regulations, its deviation from the regulations' temporal requirements does not give rise to an affirmative defense to foreclosure, and this court should adopt a "common-sense" approach to interpreting the regulations' requirements; and (3) defendants' argument that the certified letter was insufficient for not addressing Rivkah as guardian of Baez's estate is not a basis to dismiss the foreclosure. As explained below, we conclude that only plaintiff's argument concerning the effect of Rivkah's bankruptcy has merit.

¶ 25    The trial court granted defendants' motion pursuant to section 2-619(a)(9) of the Code, which allows dismissal where "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2018). We review *de novo* the dismissal of a complaint pursuant to section 2-619(a)(9). See *McIntosh v. Walgreens Boots Alliance, Inc.*, 2019 IL 123626, ¶ 17.

¶ 26    In their cross-appeal, defendants contend that the trial court erred in finding that plaintiff's conduct over eight years of litigation was not sanctionable. We review for an abuse of discretion a trial court's ruling on a motion for Rule 137 sanctions. See, *e.g.*, *Rubin & Norris, LLC v. Panzarella*, 2016 IL App (1st) 141315, ¶ 49.

¶ 27                                          A. Plaintiff's Appeal

¶ 28    The parties do not dispute that, as defendants' mortgage was insured by HUD, it was subject to specific servicing requirements. See 24 C.F.R. § 203.500 (2014); *U.S. Bank Trust National Ass'n v. Hernandez*, 2017 IL App (2d) 160850, ¶ 28. As previously noted, those requirements are found in Title 24, sections 203.604 and 203.606 of the Code of Federal Regulations (24 C.F.R. §§ 203.604, 203.606 (2014)), and they provide that, before bringing a foreclosure action against a defaulting borrower, "[t]he mortgagee must have a face-to-face interview with the mortgagor, or make a reasonable effort to arrange such a meeting, before three full monthly installments due on the mortgage are unpaid," to seek this interview through a certified mail request and a visit to the property, and to review its file to determine compliance with appropriate servicing requirements. See *Hernandez*, 2017 IL App (2d) 160850, ¶ 28. A "reasonable effort" is defined as sending a minimum of one certified letter to the mortgagor and making at least one trip to see the mortgagor at the mortgaged property. 24 C.F.R. § 203.604(d) (2014). The regulations provide that the mortgagee may not institute foreclosure proceedings before complying with section 203.604. See 24 C.F.R. § 203.500 (2014) ("It is the intent of the Department that no mortgagee shall commence foreclosure or acquire title to a property until the requirements of this subpart have been followed."); see also 24 C.F.R. § 203.606(a) (2014) ("Before initiating foreclosure, the mortgagee must ensure that all servicing requirements of this subpart have been met.").

¶ 29    In Illinois, the failure to comply with HUD's mortgage servicing requirements is a complete defense to a mortgage foreclosure action. *Federal National Mortgage Ass'n v. Moore*, 609 F. Supp. 194 (N.D. Ill. 1985); see also *PNC Bank, National Ass'n v. Wilson*, 2017 IL App (2d) 151189, ¶ 18; *Denton*, 120 Ill. App. 3d at 579. "Because these government-insured mortgage programs recognize that mortgagors will often have difficulty making full and timely payments, HUD promulgated very specific regulations outlining the mortgage servicing responsibilities of mortgagees." *Wilson*, 2017 IL App (2d) 151189, ¶ 18. Moreover, "[t]he

notice requirements are integral to the government-insured mortgage loan program and insure that financially strapped homeowners will have every opportunity to take informed steps to retain their homes." *Mortgage Associates Inc. v. Smith*, No. 86C1, 1986 WL 10384, at *2 (N.D. Ill. Sept. 16, 1986) (citing *Moore*, 609 F. Supp. at 197). A mortgagee's failure to comply with the servicing requirements can be raised by the mortgagor as an affirmative defense. *Denton*, 120 Ill. App. 3d at 578-79. The burden of proving an affirmative defense is on the party asserting it. *Deutsche Bank National Trust Co. v. Gilbert*, 2012 IL App (2d) 120164, ¶ 16.

¶ 30    As section 203.604(c) of Title 24 of the Code of Federal Regulations provides that no face-to-face meeting is required if any of five exceptions apply, plaintiff opens its arguments with the assertion that it simply was not required to comply with the other requirements within that section. Indeed, plaintiff asserts that it was not required to comply with the regulations, because Michael no longer lived at the subject property. See 24 C.F.R. § 203.604(c)(1) (2014). Thus, it argues, efforts to meet him there to arrange a face-to-face meeting would have been futile and unnecessary. In addition, and separate from the enumerated exceptions within the regulations, plaintiff, relying on *Wilson*, 2017 IL App (2d) 151189, ¶ 26, argues that it did not need to comply with the regulations, because, in 2015, Rivkah was discharged of her debts in bankruptcy and did not redeem the property or reaffirm the debt; therefore, she is barred from raising a defense to foreclosure. Plaintiff contends that, because Rivkah has no defense, requiring it to comply with the regulations is an impermissible futile act. See *id.*

¶ 31    Based upon the complaint's alleged *date of default*, we do not find these arguments, exclusive of Rivkah's discharge in bankruptcy, persuasive. For example, even if, in 2017, Michael no longer lived at the property, it is apparently undisputed that, in 2011, he *did* live there. As such, plaintiff's argument concerns conditions that did not exist in 2011, *i.e.*, when, according to the *default date alleged in the complaint*, plaintiff was required to perform its obligations pursuant to the regulations.[5] Specifically, the regulations require the face-to-face meeting, or a reasonable effort to arrange such a meeting, before three monthly installments due on the mortgage are unpaid; the foreclosure action may not be filed until those acts occur. Thus, it is the alleged default date, *not* the date when the complaint is filed, that must be the benchmark for evaluating whether plaintiff complied with section 203.604 in a timely fashion. As such, the borrower's circumstances at the time of the alleged default date must *also* control; otherwise, no matter how much time has passed, a lender's failure to comply with the regulations around the time of the default would be of no consequence. Indeed, there would be little to no incentive to timely comply, if a lender could simply sit on its hands until circumstances change and, then, seek damages back to the original default date, while claiming that compliance is now futile. Instead, where plaintiff *alleged* a default date in 2011, whether it complied with section 203.604 must be judged by what *it did in 2011*, not Michael's circumstances five years later. Moreover, as residency is flexible, it may be theoretically

---

[5]We note that plaintiff rejects the suggestion that any contact with Baez's estate was required, as Rivkah is the guardian of the estate. However, as defendants noted, the estate is a separate legal entity and a mortgagor, and the trial court expressed skepticism that the failure to contact the estate, even if Rivkah was the guardian, could be excused. We agree; as explained in this decision, while we agree that Rivkah's bankruptcy impacted her available defenses in her personal capacity, we otherwise reject plaintiff's arguments concerning the two other mortgagors.

possible for Michael to become current and return to the residence, such that requiring compliance with the regulations is not futile.

¶ 32    Critically, however, this is *not* the case for Rivkah because, before the 2017 complaint was filed, she obtained a discharge in bankruptcy and is no longer bound by the mortgage contract. Accordingly, we agree with plaintiff that the bankruptcy discharge precludes Rivkah's ability to raise the regulations as a defense to the 2017 complaint. In *Wilson*, we agreed that the lender did not comply with section 203.604(d), where it did not provide proof from the postal service that the letter was certified as having been dispatched, yet we held that vacating the foreclosure and requiring a new notice would be futile because the borrowers had discharged their debts through bankruptcy and, thus, had nullified the contract with the lender and could not benefit from the protections bestowed under that contract. *Id.* ¶¶ 4-5, 23-26. Consistent with *Wilson*, if plaintiff were to pursue a new foreclosure action alleging a *new* (*i.e.*, post-2015) default date, Rivkah's bankruptcy discharge would render futile (as to her personal, not representative, capacity) any prefiling or concurrent compliance with section 203.604. However, plaintiff's failure to comply with the regulations at the time of the 2011 default date is *also* not, in light of the discharge in bankruptcy, prejudicial to Rivkah *now*. Specifically, Rivkah's discharge in bankruptcy without affirmation means that she is no longer bound by the mortgage contract, as her debt to plaintiff has been discharged. Conversely, she also can no longer enjoy the benefits of that contract, *i.e.*, she cannot use the regulations as a "sword." See *id.* ¶¶ 25-26. Thus, in light of the bankruptcy discharge, the alleged default date as to Rivkah is irrelevant; regardless of the default date alleged, she has no personal liability under the mortgage contract. Once the bankruptcy discharge occurred in 2015, she was no longer prejudiced by the errors of which she complains.

¶ 33    As to plaintiff's other arguments concerning its obligations, or lack thereof, in 2017, we first have to address its underlying argument that its actions in 2017 substantially complied with the regulations and, thus, cured its earlier failures, an argument that was not accepted by the trial court. Plaintiff does not dispute that, in Illinois, when a lender has not made reasonable efforts to comply with section 203.604's requirements, a borrower may have a defense to foreclosure. However, it asserts that this affirmative defense has never been extended to include situations where reasonable efforts *are* performed, but simply outside of the time frame identified in section 203.604. It asks us to hold that making reasonable efforts outside of the designated time frame is permissible, as long as they are made before filing for foreclosure. According to plaintiff, holding otherwise would mean that, once a mortgage company fails to meet the initial three-month time requirement for a face-to-face meeting or a reasonable attempt to hold that meeting, foreclosure would *never* be allowed, because the lender cannot ever go back to act before the initial three payments were missed. This result, plaintiff urges, creates a windfall to borrowers and an unjust penalty to lenders. Plaintiff asserts that there is no Illinois decision directly on point concerning the application and interpretation of section 203.604, but it notes that other, federal decisions support a "common-sense" approach and have held that substantial compliance with section 203.604 is sufficient. Plaintiff suggests that, for uniformity of law, we should look to those decisions for guidance. We are not persuaded, for three overarching reasons.

¶ 34    First, while we do not list all the decisions here (indeed, some are slip opinions and many are factually distinguishable), plaintiff is generally correct that courts in other jurisdictions have held, in essence, that strict compliance with section 203.604's three-month window is not

required and that, as long as the requirements are reasonably performed before the foreclosure is filed, common sense dictates that the regulations should not be construed to command an impossibility. See, *e.g.*, *U.S. Bank National Ass'n v. McMullin*, 47 N.Y.S.3d 882, 890 (Sup. Ct. 2017) ("It seems inconceivable that the HUD regulations, promulgated in respect to the federal agency's role as an insurer of mortgages, were intended to create a permanent and impenetrable barrier to foreclosing on the property of a borrower who has not made a mortgage payment for more than eight years"; "the Court concludes that the first sentence of 24 C.F.R. 203.606(a), which encompasses the regulatory requirement of a face-to-face meeting before a borrower misses three payments, does not prohibit a lender from commencing a foreclosure action where, as here, the lender has substantially complied with the Part 203 regulations prior to commencement, strict compliance with the regulation no longer is possible, and additional loss-mitigation efforts would be futile."). In *Washington Mutual Bank v. Mahaffey*, 154 Ohio App. 3d 44, 2003-Ohio-4422, 796 N.E.2d 39, ¶ 24, the court noted:

> "the scheme of the regulation is that a lender may not commence foreclosure until at least three full monthly installments are due but unpaid, and the lender, before initiating foreclosure, must ensure that the servicing requirements have been met, including the face-to-face interview requirement. It would be inconsistent with Section 203.606(a) to allow a lender to commence foreclosure after three full months of default, without having complied with the face-to-face interview requirements of Section 203.604(b). Although it would *not* be inconsistent with 203.606(a) to construe Section 203.604(b) *to forever bar* a foreclosure action when the lender has failed to comply with the face-to-face interview requirement during the first three months of default, we conclude that a construction to that effect would be *unduly harsh* to lenders ***." (Emphases added.)

¶ 35 However, while other jurisdictions may have adopted this "common-sense" approach, we emphasize again that Illinois courts, starting with *Denton*, have held that the failure to comply with HUD's servicing regulations is a defense to foreclosure. *Denton*, 120 Ill. App. 3d at 579 ("[T]he failure to comply with these servicing regulations which are mandatory and have the force and effect of law can be raised in a foreclosure proceeding as an affirmative defense."). Federal courts have applied Illinois's interpretation of the regulations to find that a failure to comply is a "complete defense" to a foreclosure action. See, *e.g.*, *Mortgage Associates Inc.*, 1986 WL 10384, at *2 (citing *Moore*, 609 F. Supp. at 197). While plaintiff's substantial-compliance argument is not inherently inconsistent with general authority allowing defendants an affirmative defense to foreclosure, it remains that our courts have generally required compliance with the regulations before a foreclosure judgment may be entered. See, *e.g.*, *Hernandez*, 2017 IL App (2d) 160850, ¶¶ 28, 36 (reversing summary judgment in mortgagee's favor in a foreclosure case, where mortgagee offered no proof that the letter was "dispatched" as required by section 203.604; declining to hold that "noncompliance with section 203.604 may be excused in cases of inevitable foreclosure (however that may be determined)," but also declining to decide whether substantial compliance would be permitted if the letter was dispatched by a private carrier, as opposed to the United States Postal Service, as required by the regulations). Thus, Illinois authority does not support that the regulations require only substantial compliance before foreclosure actions may proceed.

¶ 36 Plaintiff takes issue with the fact that requiring strict compliance with the regulations might forever preclude foreclosure, when section 203.500 of Title 24 of the Code of Federal Regulations specifies that the penalty for noncompliance with regulations may result in a fine

or withdrawal of HUD's approval. Yet, this point was already rejected in *Denton*, which noted that a fine on the lender does nothing to help the homeowner:

> "While it is true that 24 C.F.R. 203.500 provides that a pattern of refusal or failure to comply with the servicing requirements will be cause for withdrawal of a mortgagee's approval to participate in the federal mortgage insurance program, we do not believe this to be an adequate remedy for the individual mortgagor. The legislative purpose of the National Housing Act [(Act) (12 U.S.C. § 1701(t) (1982))] *** is to assist in providing a decent home and a suitable living environment for every American family. Thus, the primary beneficiaries of the [A]ct and its implementing regulations are those receiving assistance through its various housing programs. This would include the defendants as mortgagors of a H.U.D. insured mortgage.

> Therefore, in order to effectively insure that the interests of the primary beneficiaries of the H.U.D. mortgage servicing requirements are being protected, mortgagors must be allowed to raise noncompliance with the servicing requirements as a defense to a foreclosure action. H.U.D.'s withdrawal of a mortgagee's approval to participate in the mortgage insurance program after repeated violations of the servicing requirements is a useless remedy for the individual faced with the immediate problem of the foreclosure action; an action which could possibly be avoided by either assignment of the mortgage to H.U.D. or further efforts to arrange a revised payment plan." *Denton*, 120 Ill. App. 3d at 579.

¶ 37     Second, plaintiff's entire argument presumes that its efforts here were reasonable but simply fell outside of the required time frame. Even if, under plaintiff's approach, reasonableness and equity remain the key touchstones, we see no reasonable compliance where plaintiff did not even attempt to comply with the regulations until *five years* after the *default date alleged* in the complaint. Indeed, even some of the foreign authority upon which plaintiff relies suggests that viewing noncompliance as an affirmative defense might indeed benefit the lender, as it may allow for equitable considerations, but this would still not *require* the court to *allow* foreclosure in the event of noncompliance. For example, in Ohio, at least one court has noted that weighing

> "equitable considerations certainly *may* preclude a lender from foreclosing when the face-to-face meeting requirement of 24 C.F.R. § 203.604 has not been satisfied. On the other hand, equitable considerations may *not* justify forever barring a foreclosure action when a lender has not complied with the face-to-face interview requirement, *even though*, as this court recognized in [*Washington Mutual Bank v. Mahaffey*, 2003-Ohio-4422, ¶ 24], it '*would not be inconsistent with [24 C.F.R.] 203.606(a) to construe Section 203.604(b)' in such a way*." (Emphases added and omitted.) *Wells Fargo Bank, N.A. v. Goebel*, 2014-Ohio-472, 6 N.E.2d 1220, ¶ 23 (App. 2d Dist.).[6]

---

[6]In Ohio, there exists debate on whether the regulations should be treated as conditions precedent to foreclosure or whether noncompliance is instead an affirmative defense. The distinction matters, according to the Ohio appellate district courts, because, if the regulations are a condition precedent, compliance becomes the *lender's* burden to establish and the requirements, once violated, might forever preclude foreclosure, whereas an affirmative defense is the borrower's burden to establish and would leave some room for the court to weigh equitable considerations:

Of course, other authority continues to view the regulations as conditions precedent to foreclosure, without any balancing of equitable considerations. See, *e.g.*, *Mathews v. PHH Mortgage*, 724 S.E.2d 156, 202 (Va. 2012) ("the face-to-face meeting requirement [of § 203.604(b)] is a condition precedent to the accrual of the rights of acceleration and foreclosure incorporated into the Deed of Trust"); *Lacy-McKinney v. Taylor, Bean & Whitaker Mortgage Corp.*, 937 N.E.2d 853, 863 (Ind. Ct. App. 2010) ("we agree with the reasoning of *Denton* and view the affirmative defense of noncompliance with HUD regulations as the failure of the mortgagee to satisfy a HUD-imposed condition precedent to foreclosure"). In any event, even if we *were* to consider equitable considerations here, they do not weigh in favor of finding that plaintiff acted reasonably, where its efforts to reach out to defendants (technically, only two of them, we might add) did not occur until 2017 though the alleged default date was in 2011 (and we do not even address defendants' arguments that the letter, service attempts, etc., made in 2017, were inherently defective for other reasons). As noted in the letter that plaintiff mailed to the property in 2017, "Borrowers who receive counseling *early* in the default process are *much more likely* to bring their mortgages current and possibly within a shorter period of time." (Emphases added.) Yet, here, defendants did not receive that opportunity "early in the process" and before only three monthly installments on the mortgage went unpaid. Rather, by the time plaintiff sent the letter, five years had passed, plaintiff had accelerated the note, and plaintiff claimed that defendants owed $160,863.59.

¶ 38 Third, we are not convinced that strictly holding the lender to the regulation's time frame results in an unduly harsh penalty to the lender that forever bars foreclosure. True, the lender cannot retroactively act in a time frame that has already passed. It is also true, however, that it would be inequitable to presume that, where a lender fails to comply with the initial three-month time frame, foreclosure is *forever* barred and that borrowers may simply remain in the premises indefinitely without ever paying their mortgage. Accordingly, we note that plaintiff itself proffers valid alternatives. Specifically, plaintiff suggests that it could, theoretically, forgive missed payments to bring the loan less than three months past due (*i.e.*, creating a scenario wherein defendants have, essentially, not been deemed to have missed any payments)

---

"One problem with failing to satisfy the face-to-face interview requirement, or all of the numerous other loan-servicing obligations in subpart C of 24 C.F.R. Part 203, each of which, following Appellant's logic, would become a condition precedent (203.606(a) applies to 'all servicing requirements of this subpart'), is that many of the regulations impose a deadline for a lender to act. Once a particular deadline has expired, the particular servicing requirement would forever prevent foreclosure. For example, 24 C.F.R. § 203.604 obligates a lender to attempt a face-to-face interview with a borrower 'before three full monthly installments due on the mortgage are unpaid.' It is unclear how a lender ever could comply with this requirement after three monthly payments become due. Months later, when the borrower raises the servicing defense, the borrower is even further behind and the window of opportunity is closed. As this court recognized in *Mahaffey*, a strict reading of 24 C.F.R. § 203.604 permanently could bar a foreclosure action where the face-to-face interview requirement is not timely satisfied. We agree with *Mahaffey* that such a result seems 'unduly harsh' and inequitable." (Emphasis omitted.) *Goebel*, 2014-Ohio-472, ¶ 23 n.4.

It appears that the Ohio courts remain divided on the issue of whether compliance with HUD regulations is a condition precedent to a foreclosure action or, instead, whether noncompliance gives rise to an affirmative defense. See *Wells Fargo Bank, N.A. v. Awadallah*, 2015-Ohio-3753, 41 N.E.3d 481, ¶ 19 (App. 9th Dist., collecting cases).

and *then*, if missed payments occur going forward, properly solicit defendants for a meeting in compliance with section 203.604 or to arrange a repayment plan.

¶ 39     Defendants do not directly respond to this proposed hypothetical process. We would note, however, that, even in *Denton*, where noncompliance was allowed as an affirmative defense, the court reversed and remanded for proceedings consistent with its decision; it did not expressly state or infer that foreclosure was *forever* barred. See, *e.g.*, *Denton*, 120 Ill. App. 3d at 581. In addition, this court has affirmed the idea of the "new-default rule," which addresses the notion that, "where a money obligation is payable in installments, a separate cause of action arises on each installment," preventing unjust results. (Internal quotation marks omitted.) *Wilmington Savings Fund Society, FSB v. Barrera*, 2020 IL App (2d) 190883, ¶¶ 19-20. We would also note that we are not convinced by plaintiff's argument that any such action would be *futile* here, on the grounds that no meeting is required with Michael (because he no longer lives at the property) and/or that defendants have not expressed any willingness to discuss repayment options. Indeed, even if true, these circumstances are precisely why plaintiff's suggested actions might *not* be futile. Forgiving payments (again, due to plaintiff's own failures) and essentially starting over might prove beneficial to plaintiff, in the sense that circumstances have purportedly changed over the years that might, for example, alter its requirements to hold face-to-face meetings and/or the availability of certain defenses to defendants. Moreover, even if plaintiff is correct that defendants have not previously expressed a desire to discuss repayment options, perhaps forgiving certain payments and starting afresh would make Michael and the estate more amenable to discussions. Indeed, in their briefs, defendants refute the accuracy of plaintiff's representation concerning their interest in loss mitigation or loan modification, noting that they had no burden to initiate loss mitigation, plaintiff did not reach out to them in 2012, and many circumstances have changed in the eight years following the initial lawsuit.

¶ 40     Plaintiff further asserts that it would be unjust to require a lender to forgive potentially years of missed payments, simply because we decide that strict compliance with the regulations is required. We agree to an extent. The payments would not exactly be "forgiven"; rather, the extent of personal liability resulting in a possible deficiency judgment would be reduced, according to the new default date alleged in the newly filed proceedings. Any loss realized upon the sale of the property without a deficiency judgment stems from plaintiff's own initial noncompliance with the regulations. "A proceeding to foreclose a mortgage is a proceeding in equity. *** Under long-standing equitable principles, a party seeking to invoke the aid of a court of equity must *do equity*." (Emphasis added.) *Wilson*, 2017 IL App (2d) 151189, ¶ 25. The regulations place upon the lender the burden to ensure, before initiating foreclosure, that it complied with the regulations (24 C.F.R. § 203.606(a) (2014) ("[b]efore initiating foreclosure, the mortgagee must ensure that all servicing requirements of this subpart have been met")), which, unless an exception exists, include a requirement to perform section 203.604's requirements in a timely fashion. Our holding simply incentivizes lenders to follow the rules or quickly cure any violation thereof, so that, in plaintiff's proposed scenario, lenders could possibly limit the number of missed payments that they might need to "forgive." It is also consistent with the *purpose* of the regulations; the requirement to meet with the borrowers before three monthly installments due on the mortgage go unpaid is to try to quickly fashion an arrangement or repayment plan that can *avoid* a default and, ultimately, a foreclosure. See, *e.g.*, *Bagley v. Wells Fargo Bank, N.A.*, No. 3:12-CV-617, 2013 WL 350527, at *5 (E.D. Va.

Jan. 29, 2013) ("12 U.S.C. § 1715, which authorizes HUD to implement [section] 203.604, requires lenders to engage 'in loss mitigation actions for the purpose of providing an alternative to foreclosure' when a borrower is in default or facing imminent default. 12 U.S.C. § 1715 [Citation.] The face-to-face meeting creates an opportunity for homeowners in default to avoid foreclosure, thus surely a plaintiff may be harmed if they are denied this opportunity, even if they are not able to pay the full debt at the time of the meeting." (Emphasis omitted.)). We also note that this purpose is delineated in the letter that plaintiff sent to the property on January 6, 2017:

> "The purpose of the [face-to-face] meeting is to provide borrowers with the opportunity to contact HUD-approved housing counseling agencies for advice and assistance to become current on their monthly mortgage payments. Housing counseling agencies will advise and assist borrowers during the period of delinquency and default. Borrowers who receive counseling *early* in the default process are *much more likely* to bring their mortgages current and possibly within a shorter period of time." (Emphases added.)

As such, we cannot agree with plaintiff's suggestion that the temporal requirements are merely a technicality.

¶ 41 In summary, in Illinois, noncompliance with HUD's regulations is a defense to foreclosure. Based upon the default date alleged in the complaint here, plaintiff did not comply with section 203.604's requirements in a timely fashion. Indeed, it did not attempt compliance until *five years* after the alleged default date. To excuse that noncompliance on the basis that, several years after the noncompliance, certain defenses might no longer be available to defendants would encourage abuse of the regulations by lenders, in the hopes that, with enough time, they would be excused from requirements or defenses might vanish. Based on the default date *it alleged* in the complaint, we see no futility in holding plaintiff to the clear servicing requirements established by the regulations. Our holding does not, however, mean that plaintiff can never foreclose. Rather, after "forgiving" past missed payments, waiting for potentially more missed payments, and timely complying with the regulations, plaintiff could, legally, file a new complaint with a new default date. The court's dismissal with prejudice of the 2017 complaint is affirmed in part, vacated in part, and remanded as to Rivkah in her personal capacity.

¶ 42                                    B. Defendants' Cross-Appeal

¶ 43 In their cross-appeal, defendants argue that the trial court erred in finding that plaintiff's conduct over eight years of litigation was not sanctionable. They argue that plaintiff knew or should have known when it filed the 2017 complaint that it was not well grounded in fact or law, because it alleged a 2011 default date, it had not complied with the mandatory HUD regulations, and its 2012 complaint had already been dismissed for the same reasons. Defendants argue that the frivolous complaint resulted in a waste of judicial resources and that the court abused its discretion in declining to impose Rule 137 sanctions. In addition, defendants argue that, if they again prevail on appeal, they are entitled to reimbursement of attorney fees under section 15-1510 of the Mortgage Foreclosure Law (735 ILCS 5/15-1510 (West 2014)). For the following reasons, we reject defendants' arguments.

¶ 44 As to Rule 137, we review the trial court's decision for an abuse of discretion. See, *e.g.*, *Panzarella*, 2016 IL App (1st) 141315, ¶ 49. Here, we cannot say that the court's decision not

to sanction plaintiff was unreasonable. See, *e.g.*, *Seymour v. Collins*, 2015 IL 118432, ¶ 41 (abuse of discretion occurs only where no reasonable person would take the view adopted by the trial court). As thoroughly discussed above, there is authority, albeit from other jurisdictions, arguably supporting plaintiff's position concerning substantial compliance with the temporal requirements of section 203.604. Accordingly, its arguments urging the court to apply that law were not frivolous. Nor were they made in bad faith, as the court's order in the 2012 dismissal expressly provided that the dismissal was *without* prejudice, for the purpose of allowing plaintiff to comply with the HUD regulations before refiling the complaint. Finally, plaintiff has, in fact, prevailed on appeal concerning the effect of Rivkah's discharge in bankruptcy on her ability to raise noncompliance with the regulations as a defense to the foreclosure complaint.

¶ 45    As to an award of appellate attorney fees and costs under section 15-1510, that section provides:

"(a) The court may award reasonable attorney's fees and costs to the defendant who prevails in a motion, an affirmative defense or counterclaim, or in the foreclosure action. A defendant who exercises the defendant's right of reinstatement or redemption shall not be considered a prevailing party for purposes of this Section. Nothing in this subsection shall abrogate contractual terms in the mortgage or other written agreement between the mortgagor and the mortgagee or rights as otherwise provided in this Article which allow the mortgagee to recover attorney's fees and costs under subsection (b).

(b) Attorneys' fees and other costs incurred in connection with the preparation, filing or prosecution of the foreclosure suit shall be recoverable in a foreclosure only to the extent specifically set forth in the mortgage or other written agreement between the mortgagor and the mortgagee or as otherwise provided in this Article." 735 ILCS 5/15-1510 (West 2014).

¶ 46    Defendants contend that there are two main factors warranting reimbursement in this case. First, plaintiff's alleged bad faith over eight years of litigation. Again, we reject that position. Second, defendants assert that the public policy behind section 15-1510 favors reimbursement, as homeowners wrongfully dragged into foreclosure court by lenders must grapple with numerous fees and costs associated therewith. Defendants assert that the note and the mortgage at issue here afford them a right to recover fees and costs.

¶ 47    Plaintiff responds that we should deny defendants' request for fees and costs, in part because defendants already received a section 15-1510 award for the fees and costs they incurred before the trial court. Further, plaintiff essentially asks that we remain mindful that all or some of the defendants have lived in the property for almost nine years without making payments on the mortgage and, thus, we should not award fees and costs associated with this appeal.

¶ 48    Defendants cite no authority to support our awarding, in the first instance, of attorney fees and costs related to this appeal under section 15-1510. Indeed, such an award is discretionary and inherently requires fact finding. Any such motion should be brought before the trial court, which maintains discretion to determine whether such an award is warranted, as well as to assess the availability of recovery for appellate fees and costs under the note and the mortgage, the reasonableness of any requested fees, and the weight to give any evidence defendants might offer to support a fee request related to this appeal. See, *e.g.*, *Deutsche Bank National Trust Co. v. Barrera*, 2020 IL App (3d) 180419, ¶ 27 (remanding for trial court to consider, in its

discretion, an award of costs and fees related to the appeal under section 15-1510).

¶ 49                                    III. CONCLUSION

¶ 50        For the reasons stated, the judgment of the circuit court of Kane County is affirmed in part, vacated in part, and remanded as to Rivkah in her personal capacity, as well as for any proceedings concerning sanctions, costs, and/or fees.

¶ 51        Affirmed in part, vacated in part, and remanded with directions.